## JANUARY TERM 1870, AT BOSTON.

### [CONTINUED FROM VOL. CIII.]

PRESENT:

Hon. REUBEN A. CHAPMAN, Chief Justice.
Hon. HORACE GRAY, Jr.,
Hon. JOHN WELLS,
Hon. JAMES D. COLT,       } Justices.
Hon. SETH AMES,
Hon. MARCUS MORTON,

## MIDDLESEX COUNTY.

### Proprietors of Locks and Canals on Merrimack River vs. Nashua and Lowell Railroad Company.

A specification of nontenure and disclaimer, pleaded with the general issue, to a writ of entry, is falsified by proof of occupation of the demanded premises by the tenant with a permanent building, although such occupation is by a mistake of boundary and without intention to disseise.

The misappropriation by a railroad corporation of land taken by right of eminent domain for the location of the railroad cannot be set up as working a forfeiture of the franchise on a writ of entry brought by the owner of the fee; but the demandant may maintain the writ to establish his right in the land and recover damages or mesne profits for the unauthorized use of it.

The surrender by a railroad corporation into the exclusive use and occupation of private traders or manufacturers for their trade or manufactures, as tenants for rent, of land taken by right of eminent domain for the location of the railroad, and buildings erected thereon

by the corporation as freight-houses or engine-houses, is a misappropriation of the land, which entitles the owner of the fee to maintain a writ of entry to establish his right therein and recover damages or mesne profits for the unauthorized use of it; although the corporation derives advantages in its freighting business from the carriage of merchandise for the tenants and the receipt and delivery of it at these buildings instead of at the regular station-houses, and the buildings remain adapted to the purposes for which they were erected, and the corporation does not intend to permanently abandon the use of the premises for the railroad.

WRIT OF ENTRY dated June 28, 1869, to recover two lots of and in Lowell, marked respectively A and C on a plan of a large tract of land, which was made part of the agreed facts on which the case was submitted to the determination of the full court, substantially as follows:

The demandants were seised in fee simple of the tract of land, and except as hereinafter stated have not been disseised or dispossessed of any part of it. In 1838, the tenants, by authority of their charter, St. 1836, *c.* 249, and the general laws relating to railroads, and without the consent of the demandants, filed their location over and took a part of the tract, including the whole of both lots A and C, except a narrow strip forming part of lot A and marked B on the plan, and paid to the demandants damages regularly assessed for the taking, as in such case required by law. No question is made as to the regularity of their proceedings in this location and taking. Across the land thus taken they constructed and have ever since maintained their railroad; but no portion of their road-bed was ever built, or of their tracks ever laid, in either of the lots A and C.

In 1838, the same year in which they took the land, they built upon it a wooden freight-house, which they placed partly on lot A; and they continued to use the building as a freight-house until 1846, when, having established a freight depot elsewhere in Lowell, they ceased to use it in that manner. In 1851 they entered into an agreement with the firm of Blanchard & Coggin, flour and produce dealers, to fit it and lease it to them for a warehouse for that business. Accordingly they changed its position, moving it so that its principal doors, which formerly faced towards the railroad track, were made to face towards a public street, and built an addition to it, and made certain alter-

ations in its interior; but "the building, thus altered, was not rendered unfit for a freight-house, but could be used as well for that purpose now as before the alteration." As thus changed in position, the building covered lot A. "In making said alterations, a portion of the building and of the addition thereto was placed outside of the location of the railroad, on other land of the demandants, which is that portion of lot A marked B on the plan; and said building has without consent or license of the demandants continued thereon ever since. When the alterations were completed, in 1851, the railroad corporation leased the building and the land under the same, and necessary to the enjoyment thereof, including the whole of lot A, to Blanchard & Coggin for their private and exclusive use and occupation, for the carrying on therein of their said private business, and have ever since continued and still continue to lease the premises to them and others, persons who have succeeded to the business of Blanchard & Coggin, for their exclusive use and occupation for their said business and trade, and receiving rent of them therefor. And Blanchard & Coggin, and the other persons who succeeded them in their said business, ever since 1851 have under lease thereof from the railroad corporation had and held the exclusive use and occupation of the premises for the carrying on therein of said private business, paying rent therefor to the lessors. And the premises are not, and since 1851 have not been, otherwise used for railroad purposes. Said lease to Blanchard & Coggin and their successors was not in writing." The flour and produce, which Blanchard & Coggin and their successors stored on the premises, were "all brought over the railroad, and a large portion of them unloaded directly from the cars into the building, rendering it unnecessary for the railroad corporation to deposit them in its own freight-house, but the portion not so unloaded is deposited in the freight-house of the railroad corporation." "At the time of the commencement of this action, and for several years before, the premises have been in the exclusive use and occupation of the firm of Page, Kidder & Co., who succeeded Blanchard & Coggin as tenants at will of the railroad corporation and paying as rent therefor $400 per

year.   Before the commencement of this action the demandants demanded of Page, Kidder & Co. the possession of the premises, and they refused to surrender the same." Under date of August 19, 1867, the demandants' agent sent a letter to the railroad corporation, calling attention to the premises as occupied by Page, Kidder & Co., asserting that such use was for a purpose to which the demandants had a right to object, but adding that " they have, however, no desire to interfere with the present use, if their rights can be protected and they can receive a fair share of the income ; " to which the agent of the railroad corporation replied that he was instructed by the directors to say that the use to which the premises were put did not seem to them inconsistent with or an infringement on the rights of either party, and that they declined to pay to the demandants any part of the income of the premises, and he added : " In order that it may distinctly appear that your rights are not to be prejudiced by the action of the railroad corporation, I am further instructed to say that the premises in question are held in reserve for railroad use only, it being the intention of the railroad corporation to occupy them for such purposes exclusively ; and they hereby disclaim any intention or expectation of acquiring by use and possession any rights therein not secured them either by location or purchase." No notice was ever given to the railroad corporation, before the commencement of this action, that any part of the building was on land outside of the location of the railroad, " and the railroad corporation did not know that fact until after the commencement of the action, the said building, when moved, having been, by mistake and without intending so to do, placed outside of the location, on B; and at the term at which the action was entered the tenants in the action specified nontenure and disclaimer as to said B."

In 1847, nine years after their taking of the demandants' land the tenants built a brick engine-house for their locomotive engines, which covered the whole of lot C, and extended beyond it upon land owned by the tenants and not embraced in the plan.   Inside of this building they dug ash-pits and walled them up with brick and mortar, laid a brick floor, built turn

tables, and laid tracks which extended outside of the building and connected with the main tracks of the railroad. In 1860, having previously ceased to use the building as an engine-house, they entered into an agreement with the firm of Cole, Nichols & Wilson, iron-founders, to fit it and lease it to them for a foundry. Accordingly they removed the walls of the ash-pits and filled up the pits, removed the brick floor and the turn-tables and "other fixtures adapting said building to be used as an engine-house," and built an addition to the building for the purpose of adapting it to the use, occupation and business of Cole, Nichols & Wilson; and on April 1, 1861, they gave Cole, Nichols & Wilson a written lease of the premises for five years, at an annual rent of $400, which stipulated that "said lessees may make alterations at their own expense in the buildings and grounds embraced in this lease, as may be necessary to convert the premises into a foundry." Under this lease, Cole, Nichols & Wilson "took possession of the premises, erected thereon large furnaces for melting iron, and set up other fixtures and machinery therein, usual in iron foundries, and they, the survivors of them, (Wilson being dead,) continued in the exclusive use and possession thereof, as a general iron foundry, for the carrying on therein of their private business and trade of making iron castings, during the whole of the term of said lease; and ever since the expiration of said term the railroad corporation has continued to let by parol the same premises and the exclusive use thereof to said Cole & Nichols, and the latter have, as lessees of the railroad corporation, continued in the exclusive use and occupation of the same for the purpose of their private business aforesaid, paying to their lessors rent therefor; and since 1860 lot C has not otherwise been used or occupied for railroad purposes." "No part of the building which is situated on lot C was altered when leased, or since it was leased, the ash-pits and turn-tables being in that part of the building situated on land owned in fee by the lessors; and no erections or changes have been made in that part of the building situated on the demanded premises, nor is said part of the building used by the lessees for any machinery or other erections. A larg

portion of the materials used by the lessees in their business is brought to them over the railroad and delivered to them at said building without being stored by the railroad corporation ; and a small part of the manufactures of the lessees is transported over the railroad, being taken directly from the building without having been stored in any other part of the premises of the railroad corporation before being loaded on the cars. The building could be adapted for railroad purposes at a small expenditure Before the commencement of this action the demandants demanded of Cole & Nichols possession of said second demanded lot, and Cole & Nichols refused to surrender the same."

It was further agreed that the directors of the railroad corporation " would all testify, if competent for them so to do, that they never intended to permanently abandon the use of the demanded premises for railroad purposes, should the future exigencies of the railroad corporation require the same for such use ; " and that " there is nothing to control this testimony except the facts herein stated."

" If upon the above statement of facts the demandants have any cause of action against the railroad corporation or their lessees, or either of them, such judgment is to be rendered in this action against the tenants as the demandants would be entitled to recover upon said facts in any form of action against the tenants or either of their lessees, and the case referred to an auditor to assess the mesne profits or damages ; otherwise judgment to be for the tenants."

*A. P. Bonney*, for the demandants.

*J. G. Abbott*, for the tenants.

WELLS, J. Under this agreed statement, the form of action and the pleadings become immaterial. But the principles which govern proceedings under a writ of entry are well adapted to test the relations and rights of the parties, in respect to the matters in controversy in this suit.

In regard to that part of the lot first described which is designated as parcel B, the title of the demandants, and their right of immediate possession are admitted. The only question is whether the action may be defeated by the specification of non-

tenure and disclaimer in defence. The defendant corporation has been in the occupation of this parcel, since 1851, by means of a permanent structure placed thereon. That occupation is, in its nature, adverse, and indicates a claim of title. That it was unintentional, and by mistake as to the true line of boundary, does not affect its legal character as a disseisin. When the suit was brought, the demandants were dispossessed; and there has been no restoration of the possession. These facts falsify the plea, and entitle the demandants to a judgment. *Allen v. Holton,* 20 Pick. 458. *Johnson* v. *Boardman,* 6 Allen, 28.

The other parcels sued for are included within the limits of the location of the railroad. The buildings thereon, which had been previously adapted to the uses of the railroad, were changed so as to adapt them to the purposes of private business, and the trade of merchants. They have been so occupied from that time; being let for rent to tenants "for their exclusive use and occupation for their said business and trade." Although the railroad corporation may derive some advantages in its freighting business, from the carriage of goods for its tenants, and from the receipt and delivery of their goods at these buildings, instead of its own freight-houses, yet we think it would be a distortion of the agreed statement to regard these circumstances as sufficient to qualify the character of the occupation of the buildings, so as to bring it within the range of any purpose for which the corporate franchises were granted.

The demandants contend that this continued appropriation of the buildings is an abandonment of its legal rights by the corporation; and that it has become a mere disseisor; so that the demandants are entitled to resume their title and possession, freed from the servitude.

That property, once taken and held by right of eminent domain, may be abandoned, so as to restore the original owner to his former rights, we are not disposed to question. But the facts here show no such abandonment. On the contrary. the tenant has been in the constant use and control of the property. The erection of the buildings was consistent with a proper enjoyment of the easement. *Worcester* v. *Western Railroad Co*

4 Met. 564. It did not destroy the easement, nor defeat its exercise, nor indicate an intent to abandon it. *Dyer* v. *Sanford,* 9 Met. 395, 402. *Hayford* v. *Spokesfield,* 100 Mass. 491. A misuse, however great the perversion, is not an abandonment. The subsequent unauthorized appropriation of the buildings did not therefore put an end to the right of use for the legitimate purposes of the franchise granted. *Sprague* v. *Waite,* 17 Pick. 309, 319. An easement does not become merged, or lost, by a disseisin, or a wrongful claim of title against the owner of the servient tenement. *Tyler* v. *Hammond,* 11 Pick. 193, 220. Besides, the corporation has continued the legitimate exercise of its franchise over so much of the location as is required for the present use and accommodation of its tracks. Its location has not been abandoned; and the right, derived by law from that location, to use any part of the land within its limits, is not such a mere license as will become void *ab initio* by reason of abuse or excess in its exercise. This position of the demandants is therefore not maintained, even if the testimony of the directors of the railroad, offered to negative the intent to abandon, be rejected.

If the misappropriation worked a forfeiture, *pro tanto,* of the franchise originally authorized, or was a sufficient ground for decreeing a forfeiture, that could not be set up collaterally in a suit by a private party. Even in a direct suit for the purpose, a private party cannot obtain a decree of forfeiture, vacating, in whole or in part, a franchise or right held under lawful public authority. Proceedings of that nature are applicable only to an attempt to exercise privileges without lawful authority; and the exclusion thereby obtained extends only to such unlawfully assumed franchise. A public franchise can be forfeited only to the public. *Boston & Lowell Railroad Co.* v. *Salem & Lowell Railroad Co.* 2 Gray, 1. *Fall River Iron Works Co.* v. *Old Colony & Fall River Railroad Co.* 5 Allen, 221. *Heard* v. *Talbot,* 7 Gray, 113.

So far, then, as the demandants seek to recover possession and control of the property, as of their former right, their suit must fail. If they can recover any judgment for the land cov-

ered by the location, it must be rendered subject to all the lawful rights of the tenant under the franchises conferred by its charter and the location of its road.

It does not follow that the action cannot be maintained at all. The fee of the land remains in the original owners, notwithstanding the location of the road. It is true that the nature of the use for which the land is taken is such as may require, and therefore authorize, complete possession and control by the railroad corporation. The occupation and use of land which it is entitled to enjoy is declared to be "permanent in its nature, and practically exclusive," in *Hazen* v. *Boston & Maine Railroad*, 2 Gray, 577, 580. The mode of occupation, and the degree of exclusiveness, necessary or proper for the convenient exercise of its franchises, are within the absolute discretion of the managers of the corporate functions. They are the sole judges of what is proper or convenient as means for attaining the end and performing the service for which the corporate franchises were granted. *Brainard* v. *Clapp*, 10 Cush. 6. *Boston Gas Light Co.* v. *Old Colony & Newport Railway Co.* 14 Allen, 444. *Ham* v. *Salem*, 100 Mass. 350.

But however extensive the right which the corporation thus takes by its location, it is not a fee, nor a freehold estate, but an easement only.; not a corporeal interest, but an incorporeal right. Its right of occupation, however exclusive, is incidental only, and as a means of exercising the privileges and performing the functions defined by its charter. See *Boston Water Power Co.* v. *Boston & Worcester Railroad Co.* 16 Pick. 512, 522; *Weston* v. *Foster*, 7 Met. 297; *Tucker* v. *Tower*, 9 Pick. 109; *Harback* v. *Boston*, 10 Cush. 295. The owner of the fee in land thus subjected to a public easement may maintain an action of trespass or a writ of entry against any one whose entry or acts upon the premises would support the action, unless he can justify under the authority of the party having the easement. Per Sedgwick, J., in *Commonwealth* v. *Peters*, 2 Mass. 125. *Perley* v. *Chandler*, 6 Mass. 454. *Robbins* v. *Borman*, 1 Pick. 122. *Hancock* v. *Wentworth*, 5 Met. 446.

The title and right of the plaintiffs in this action are therefore sufficient to enable them to maintain their writ of entry. In what manner and to what extent will the rights of the tenant serve to defeat the action, or modify the judgment?

It is manifest that, if the general issue were pleaded, and nothing more, the title to the freehold being thus alone put in issue, the demandants must prevail. But suppose the defendant corporation should disclaim title, and specify the rights and authority under which it held the occupation. This would in effect be equivalent to a plea of special nontenure or special disclaimer. Such a plea, if according to the truth of the case, would be a complete defence to the action. But the demandants may falsify that plea, that is, may show that the party impleaded is, nevertheless, tenant of the freehold. Jackson on Real Actions, 96, 101. *Prescott* v. *Hutchinson*, 13 Mass. 439. *Creighton* v. *Proctor*, 12 Cush. 433, 438. *Dolby* v. *Miller*, 2 Gray, 135. *Johnson* v. *Phillips*, 13 Gray, 198. Whenever, upon issue joined on such a plea, it is made to appear that the tenant in the action has in fact asserted rights in, or done acts upon, the premises, which are not justified by the special interest or authority relied on, and which from their character imply a claim of title, or require title to the estate itself for their justification, the plea fails. In this respect, the only difference between a general and a special disclaimer or nontenure is in the evidence requisite to falsify the plea and establish a disseisin. Where there is a right which authorizes the party defendant, for certain purposes, to disturb the soil or occupy the land, acts done in apparent conformity therewith, or even of an equivocal nature, will be referred to that special right; although in the absence of such authority the demandant would be entitled to regard the acts as an assertion of title and a disseisin of himself. It is immaterial how great or how limited may be the special interest or authority set up in justification, except as it affects the degree and kind of proof required to show that it has been exceeded, or that it does not apply to or justify the acts done.

In respect to lands taken by railroad corporations, although the discretion of the directors is unlimited, as to the mode and extent of the use or occupation, for the purposes for which the corporation was created, yet it is definitely limited by those purposes. Any uses of the land confessedly for other purposes, cr not apparently for purposes permitted by its charter, are not protected by its authority. For such uses the owner may have his redress by any appropriate action.

A turnpike corporation may remove the earth, within the limits of its road, for the purposes of construction or repair, and may erect permanent buildings for a toll-house, with cellar and well. *Tucker* v. *Tower*, 9 Pick. 109. But it may not even take the herbage for purposes not connected with the exercise of its franchise. *Adams* v. *Emerson*, 6 Pick. 57. See also *Appleton* v. *Fullerton*, 1 Gray, 186; *Codman* v. *Evans*, 1 Allen, 443. A similar distinction, founded on the purpose of the use of a highway, was pointed out in *Stackpole* v. *Healy*, 16 Mass. 33. So also as to railroads, in respect of liability to taxation. *Worcester* v. *Western Railroad Co.* 4 Met. 564, 569. The rights of any party having an easement in the lands of another are measured and defined by the purpose and character of that easement. For all purposes consistent with that easement, the right to use the land remains in the owner of the fee. *Atkins* v. *Boardman*, 2 Met. 457, 467. *Phipps* v. *Johnson*, 99 Mass. 26. The principle is the same, however extensive the rights conferred by the easement.

In the present case, the occupation of the buildings upon the demanded premises for the general purposes of trade and mechanical or manufacturing business, by lessees having no other connection with the operations or interests of the corporation than as its tenants paying rent; and the conversion of those buildings by the corporation from their original design into private stores or shops for the purpose of so changing their use, placed them beyond the scope of the corporate purposes and functions. It is such an occupation of the land as, without warrant from the public authority, involves an assumption of ownership, and entitles the demandants to treat the corporation

as tenant of the freehold by disseisin. Jackson on Real Actions, 97. *Johnson* v. *Phillips*, 13 Gray, 198. *Johnson* v. *Boardman*, 6 Allen, 28. The fact that the corporation has a valid easement, which entitles it to a greater or less use of the land for other purposes, is no impediment to a recovery by the demandants in this action; for the judgment will be rendered subject to such valid easement as the tenant actually has. *Alden* v. *Murdock*, 13 Mass. 256. *Morgan* v. *Moore*, 3 Gray, 319. *Castle* v. *Palmer*, 6 Allen, 401. The easement of the railroad corporation is of such a nature that the demandants cannot have judgment and execution that will exclude the corporation from complete possession and control of the premises for all purposes pertaining to the exercise of its corporate franchises. But they are entitled to a judgment which shall establish their title and rights as owners of the fee, and secure to them proper damages for the wrongful use of the land, as well as their costs of suit. *Prescott* v. *Hutchinson*, 13 Mass. 439. *Richards* v. *Randall*, 4 Gray, 53. Gen. Sts. *c.* 134, § 14.

The assessment of damages or mesne profits will be made with reference to the measure of title established by the suit. As to the land within the limits of the location, the tenant has made use of it for a valuable purpose. Its charter affords no justification of that use, and no protection against the claim of the owner of the fee for the mesne profits, against any disseisor. The assessor will therefore estimate the damages, for all the parcels alike, according to the full, clear annual value of the land, not including the improvements. Gen. Sts. *c.* 134, §§ 15, 16. *Hatch* v. *Dwight*, 17 Mass. 289, 298.

As the precise mode and extent of the projection of the building upon parcel B does not appear, we cannot indicate beforehand whether any allowance should be made for improvements upon that parcel, or in what manner the structure is to be disposed of. Its situation is such as will probably lead both parties to find their interests best promoted by an amicable adjustment in relation thereto.

The computation will include six years preceding the suit, and the time since the date of the writ to the time of the return of the assessor's report. *Curtis* v. *Francis*, 9 Cush. 427, 468.

In pursuance of the agreement upon which the case is brought up to us, an assessor will be appointed to estimate the damages accordingly.

> *Judgment for the demandants, subject to all rights conferred upon the tenants by their corporate charter and the location of their railroad over a part of the demanded premises*